[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 781 
The defendant was charged with the commission of murder in the second degree committed by employing an instrument or other means to procure the miscarriage of one Freda Nadler, and in that connection inflicting a wound resulting in the death of said Freda Nadler. An affidavit of prejudice against the county of Morton in which the offense is alleged to have been committed having been filed, the cause was removed to Stark county where a trial was had which resulted in a judgment of conviction.
The following facts appear in the record: The defendant was a physician, practising his profession at Flasher in Morton county. In connection with his practice he maintained a small hospital, where he lived and had his office. Flasher is situated about forty miles from *Page 783 
the city of Bismarck which was the home of Freda Nadler. At the time of her death, Freda Nadler was twenty-four years of age. Her paternal home was in New Salem in Morton county. Some years prior to her death she had worked in the telephone office at Flasher, where she had become acquainted to some extent with the defendant. For several years she had lived in Bismarck and was engaged in some capacity in a dental office. From November, 1923, she had been living in an apartment with a young man named Holta. They were not married, but were engaged to be married. Upon the trial she was sometimes spoken of as Freda Holta and at other times at Freda Nadler. In November of 1923 she consulted a physician in Bismarck with reference to her physical condition, at the time describing some symptoms that would indicate an early stage of pregnancy. She desired to know of him her condition but no examination was then made. Return visits were made to this physician and, in December, at a time when in his judgment a diagnosis could be made positively, an examination was made and a condition of pregnancy found. It appears that Holta was the person responsible for her condition and that they continued living together until the 25th day of February, 1924. On that day the deceased left Bismarck and went to Flasher, going from Mandan to Flasher by train (some 70 miles by rail) and arriving at her destination about 6 o'clock in the evening. Aside from her condition of pregnancy, she was apparently in good health at the time of leaving Bismarck. On arriving in Flasher she went directly to the office of the defendant which was in his hospital, or she went directly to the hotel; which, does not clearly appear. If, however, she went to the hotel first, she remained there but a short while and gave up her room after visiting the office of the defendant, going again to the defendant's hospital. She remained in the hospital that night and the next day, meanwhile communicating with Holta by `phone and by mail. At about 11 o'clock at night on February 26th, the defendant called Holta by telephone and summoned him to Flasher, requesting him to come immediately. This Holta did. He engaged a taxicab in Bismarck and arrived in Flasher between 1:00 and 2:00 o'clock A.M. on February 27th, the distance by road being about 44 miles. At the hospital upon his arrival Holta met Mrs. Shortridge, who had been present when Miss Nadler died but did not tell him of her death. At that time the defendant was absent making *Page 784 
a call and Holta awaited his return about an hour. When he came he informed Holta that his "wife" had died. Holta insisted that the body be returned to Bismarck and that arrangements be made for her burial as though she had died there. The defendant, however, expressed a preference for preparation for burial being made in Morton county but yielded to Holta's wishes. Arrangements were promptly made for transporting the body from Flasher that night, Holta returning to Bismarck in the taxicab in which he had gone there and the defendant with his driver following an hour or more behind in a Ford touring car, bringing with them the remains of the deceased in the back seat. The latter arrived in Bismarck at approximately 5 o'clock in the morning of the 27th of February, the car being stopped about a block from the apartment. From there the defendant and his driver carried the body approximately a block through an alley; then the defendant and Holta the remaining distance, or from across the street into the apartment. The body was taken into the apartment and some efforts, participated in by the defendant, were made to produce the appearance that death had taken place there. Before leaving the apartment a certificate of death was made out by the defendant, giving the name of the deceased as Freda D. Holta, the personal and statistical particulars in the certificate being supplied by Holta. The medical portion of the certificate is as follows:
"Date of death: Feb. 26, 1924.
"I hereby certify that I attended deceased from Feb. 26, 1924 to Feb. 26, 1924; that I last saw her alive on Feb. 26, 1924 and that death occurred, on the date stated, at 11:30 P.M.
The cause of death was as follows: Influenza. (duration) 3 days. Contributory: Hemorrhage and shock. (duration) 2 hours. Did an operation precede death? No. Was there an autopsy? No. What test confirmed diagnosis? . . . . . . . .
"(Signed) W.R. Shortridge, M.D. "Flasher, N.D"
The body was prepared for burial in Bismarck and in regular course burial took place at New Salem. On the 25th of the following month the body was exhumed and a post-mortem examination held. There were present at the examination the coroner and undertakers, who identified the body and its condition as being the same as at the time *Page 785 
of burial, and two doctors, Dr. Bell of the medical school of the University of Minnesota, a pathologist, and Dr. Strauss of Bismarck. The doctors testified to the general condition of the body and of various vital organs. After stating the findings as to the apparently healthy condition of the body from the standpoint of nutrition, Dr. Bell stated his findings substantially as follows: That the heart was normal and not diseased; that the lungs showed no disease; that they had very little blood in them; that there was no blood in the heart; that ordinarily after death there is clotted blood in the heart; that there were no diseased organs in the body cavity — vital organs all normal; that there was no evidence of influenza; that the womb was very large, being about twice normal size; that the neck of the womb was greatly dilated; that there was a big tear on the left side about an inch and a quarter long in the long axis; that there were clots of blood around the tear, both outside and inside the womb; and that there was afterbirth present. He then testified that the cause of death was hemorrhage following induced abortion or abortion; that the absence of a blood clot in the heart, in his opinion, meant the loss of a large amount of blood before death, as the absence of such clot is not found except in such cases; that the deceased had been recently pregnant; that if she had had influenza at all, it was in mild form; that the abortion was caused by an instrument; and that there would not be a tear in the womb of the character of the tear found from a natural abortion. The testimony of Dr. Strauss followed substantially the lines indicated in the testimony of Dr. Bell. He stated his opinion to be that death was caused by hemorrhage following an induced abortion.
The first question presented on this appeal is as to the jurisdiction of the court to try the defendant because of the alleged failure of the state to arraign him in a regular or special term of the district court. It appears that the information was filed in the office of the clerk on the 15th day of July, 1924; that the February term was the last regular term convened prior to the 15th of July. It began on February 26th. The minutes show that the jury was discharged on March 5th with the statement that they "may be called later on and that the court adjourned from day to day." Between March 5th and July 15th, the date of the arraignment, it appears that the court had convened on a number of occasions — principally for the purpose of arraigning defendants *Page 786 
charged with criminal offenses and fixing sentences, trying divorce cases, holding naturalization hearings, et cetera. The regular term was held by the Honorable F.T. Lembke, while the proceedings, particularly the proceedings complained of, after adjournment "from day to day" on March 5th were conducted by the Honorable H.L. Berry, whose chambers are in Morton county. The record does not affirmatively show that Judge Berry was acting for Judge Lembke upon the latter's written request; neither does the contrary appear. It does show, however, that he was acting at the request of and in pursuance of an understanding with Judge Lembke that he should act upon all matters which might arise within the term and which had not been disposed of prior to the conditional discharge of the jury. The contention of lack of jurisdiction extends to the person presiding as judge at the time of the arraignment. It is urged that Judge Lembke was the regular presiding judge at the term and, as no affidavit of prejudice had been filed and he was not otherwise disqualified, should have presided when the defendant was arraigned.
The foregoing contentions depend largely for their validity upon the consideration as to whether or not there was a term of court open at the time of the filing of the information. Section 10,628 of the Compiled Laws for 1913 contemplates the filing of the information during the term, and, if this statute has been complied with, we think it will amply appear that no right of the defendant has been prejudiced. Under the statute, chapter 167 of the Laws of 1919, it is the duty of the Supreme Court to fix the terms of the district courts. This duty was discharged by order on June 26, 1920. This order, following the custom that had long been theretofore embodied in statute, specified the beginning date of each term but not the closing date. A term of court ordinarily continues until it is adjourned or until the beginning of the next succeeding term or until it expires by limitation established by law. Since no time is established by law for the closing of the term, and since the time had not arrived for the opening of the succeeding term, it must be considered as open unless it has been determined by some affirmative judicial act. See 15 C.J. 881. In the present case there is no order adjourning the court sine die, and the minutes indicate that court was to stand adjourned or be in recess from one day to the next subject to being reconvened to accomplish any *Page 787 
judicial purpose. The control of the continuance of a term of court once open, where not otherwise limited, is a matter within the discretion of the judge. See Stockwell v. Crawford, 21 N.D. 261, 130 N.W. 225; State v. Hargis, 84 Kan. 150, 113 P. 401. We are of the opinion that the February term of court in Morton county was open at the time of the filing of the information in question.
The record shows that upon the arraignment of the defendant every legal right was accorded to him. He was represented by counsel, the information was read to him, he was identified by name and he was given an opportunity to plead and did plead. He also filed an affidavit which invoked the power of the district judge to transfer the case to another county for trial. The judge before whom the case was tried is the judge who, the defendant contends, was not disqualified to act and who should have acted upon the arraignment. There can be no doubt that the defendant was amenable to the district court of Morton county at the time of the arraignment and neither can there be any question that every substantial right was accorded to him. All of the proceedings taking place there were preliminary to his being placed in legal jeopardy upon the trial in Stark county. It does not affirmatively appear in the record that there was any irregularity in the matter of qualifying Judge Berry to sit at the arraignment. But even assuming, without deciding, that he was not qualified to sit, either by reason of not receiving a written request from the presiding judge or by reason of being disqualified under the statutory requirement of rotation (a matter which is not decided), we are clearly of the opinion that the defendant has waived the irregularity. Not only did he affirmatively invoke the jurisdiction of the sitting judge to pass upon his right to a change of venue, but he obtained favorable action thereon. In addition to this, when the case was called for trial in Stark county, after the objections to the arraignment proceedings had been renewed and overruled, the defendant asked leave to withdraw the plea for the purpose of demurrer. It is elemental that the jurisdiction of a court to determine a matter cannot depend upon the ultimate determination in a certain way. The power to determine is the power to decide either way. Hence, the motion for leave to withdraw the plea and demur was a general appearance. The motion must be deemed to have been made in good faith. By making it the defendant *Page 788 
signified his willingness to submit an issue as to the sufficiency of the information to the then presiding judge and, for the purpose of the motion, he regarded the plea as being sufficient to raise the issues of fact. In other words he recognized that every purpose of the arraignment had been accomplished. We are of the opinion that the proceedings, both in the district court of Morton county and in the district court of Stark county, amply show that the defendant has waived irregularities, if any, touching jurisdictional matters in connection with the arraignment. See 2 Bishop, New Crim. Proc. 2d ed. § 733.
It is next urged that the court erred in not permitting the defendant to withdraw his plea and demur to the information. The merits of this contention may well be measured by considering the legal sufficiency of the information. It is said that the allegations therein are not direct and certain, as required by § 10,686 of the Compiled Laws for 1913. The defendant is charged with murder under § 9462, which defines homicide to be murder (¶ 3) "When perpetrated without any design to effect death by a person engaged in the commission of any felony." The information charges that the defendant "did unlawfully and feloniously, and without any design to effect the death of the said Freda Nadler, commit an assault with some instrument or other means to this informant unknown," and that he "did then and there unlawfully, wilfully and feloniously and without the design to effect the death of the said Freda Nadler, use and employ, insert and thrust, the said instrument and other means aforesaid upon and into the womb of the said Freda Nadler, who, at that time and place, was a woman pregnant with child, with the intent then and thereby to produce and procure the miscarriage of the said Freda Nadler, the same not then and there necessary to preserve the life of the said Freda Nadler," and that he "did then and there, by means and in the manner aforesaid, inflict in and upon the body of the said Freda Nadler, a mortal wound," etc.
These allegations clearly charge the defendant with engaging in the commission of a felony — the felony of procuring an abortion as defined in § 9604 of the Compiled Laws for 1913 — and further charge that the death of Freda Nadler followed the abortion and resulted from the wound then inflicted. There is no merit in the contention that the information fails to charge that the death occurred while the *Page 789 
defendant was engaged in the commission of the felony. The statute (§ 9462) is not open to a construction which would require such an allegation. It defines homicide to be murder when perpetrated by a person engaged in the commission of any felony. The homicide is perpetrated when the act is done which results in the death of the victim. In our opinion, the information was clearly sufficient.
It is next urged that the evidence is insufficient to support the judgment. It is argued, first, that there was no evidence that the defendant used any instrument or other means with the intent thereby to procure a miscarriage; second, that there was no evidence that it was not necessary to procure the miscarriage in order to preserve the life of the patient. It is said that there is no evidence that the defendant had originally procured the miscarriage except that she had died at his hospital.
The defendant testified to symptoms present at the time the deceased came to his hospital which indicated that a miscarriage was imminent, and in this his testimony is corroborated by that of the hotel keepers who testify to having found evidence of such symptoms in the room which the deceased occupied for a short while on the evening of February 25th. The defendant further explained the progressive character of the hemorrhage and described the symptoms pointing to the necessity for the removal of the fetus and detailed the description of the operation. He denied the use of any instrument in connection therewith.
On the other hand, the expert testimony disputes any contention that the tear in the uterus resulted from a natural abortion. And the testimony of Holta tends to show that the deceased was in normal health at the time of leaving Bismarck; and his testimony, as well as the facts disclosed by the post-mortem examination, shows the existence of no physical condition warranting the taking of the child in order to save the life of the mother, unless such condition had been brought on by the mother herself or someone else immediately before consulting the defendant. We think the evidence is sufficient to warrant the jury in finding that her condition up to the time of leaving for Flasher was the normal condition of a pregnant woman. Such evidence would further warrant the jury in finding that this condition existed until she consulted the defendant and that there was no necessity for the *Page 790 
performance of the operation which he admits he did perform. But, aside from the affirmative evidence of these facts, the jury was justified in taking into consideration the conduct of the defendant after the death of the patient. This conduct can properly be judged in the light of common experience and if, when so considered, the acts of the defendant are best accounted for by considering them as done to conceal a prior course of criminal conduct concerning the deceased, the jury may properly consider his actions as evidence of the crime charged. Bearing in mind that the relations between the defendant and the deceased were limited to the events affected by the concealment or attempted concealment and that the defendant had not even known Holta prior to the latter being called to Flasher, we think the nature and the strength of the admissions referred to so clearly appear from a mere statement of the facts that further comment is unnecessary. One whose conduct has been purely professional and righteous does not ordinarily go to such lengths to conceal it, in order to relieve a stranger or a casual acquaintance of embarrassment.
The appellant predicates error upon the giving of certain instructions, in each specification copying a sentence or two from the charge. We have examined those portions of the charge to which exception is thus taken, reading them in connection with the entire charge. When so considered, we are satisfied that there is no merit in any of the specifications. The most meritorious are practically identical with similar specifications considered at length in the case of State v. Reilly, 25 N.D. 339, 141 N.W. 720, and the decision in that case may be looked to as controlling here. We have examined the record with care and find no error prejudicial to the defendant. It follows that the judgment appealed from must be affirmed and it is so ordered.
CHRISTIANSON, Ch. J., and NUESSLE, BURKE, and JOHNSON, JJ., concur.
 On petition for rehearing.